**MICHIGAN MUTUAL LIABILITY CO. and Pittston Stevedoring Corp., Plaintiffs-Appellants,**

v.

**Phillip ARRIEN, Deputy Commissioner, Second Compensation District, Bureau of Employees Compensation, United States Department of Labor, and Isidoro Parisi, Defendants-Appellees.**

**Local 1291, International Longshoremen's Association, Philadelphia, Amicus Curiae.**

**No. 326, Docket 29241.**

United States Court of Appeals Second Circuit.

Argued March 2, 1965.

Decided April 5, 1965.

Rehearing and Rehearing in Banc Denied, April 29, 1965.

Hays, Circuit Judge, dissented.

James B. Magnor, of Kirlin, Campbell & Keating, New York City (Charles N. Fiddler, Alexander P. Gillen, New York City, on the brief), for plaintiffs-appellants.

Angelo C. Gucciardo, of Israel, Adler, Ronca & Gucciardo, New York City, for defendant-appellee Parisi.

Morton Hollander, Dept. of Justice, Washington, D. C. (John D. Douglas, Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, David L. Rose, Dept. of Justice, on the brief), for defendant-appellee Arrien.

Abraham E. Freedman and Avram G. Adler, of Freedman, Borowsky & Lorry, Philadelphia, Pa., for amicus curiae.

Before MOORE, KAUFMAN and HAYS, Circuit Judges.

KAUFMAN, Circuit Judge.

The issue on this appeal is a narrow one—whether to set aside a compensation award to a stevedore, Isidoro Parisi, based upon an administrative finding that he was injured "upon the navigable waters of the United States" within the meaning and coverage of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 903(a).

The employer, Pittston Stevedoring Corp., and its compensation underwriter, Michigan Mutual Liability Co., brought this action in the District Court against Parisi and Arrien, the Deputy Commissioner of the Second Compensation District, Bureau of Employees Compensation, United States Department of Labor, seeking to enjoin enforcement of the award. 33 U.S.C. § 921(b). Rejecting the contention that the injury giving rise to the claim was not covered by the Act, Judge Palmieri sustained the administrative determination. He granted the Deputy Commissioner's and Parisi's motion for summary judgment and denied plaintiffs' motion for the same relief. From the judgment entered on the Court's order, Pittston and Michigan Mutual appeal.

Although the legal precepts are sharply contested, the basic facts are undisputed. On September 4, 1963, Parisi, a longshoreman employed by Pittston, was helping discharge cargo from the S.S. Copiapo at a pier in Brooklyn, N. Y. To provide additional and adequate working space for greater efficiency, the workers set up a "skid"—a removable wooden, rectangular platform, approximately six feet by ten feet—extending over the waters between the vessel and the wharf. The skid was necessary because the wharf's narrow stringpiece did not extend far enough beyond the shed to permit the stevedores to walk around the unloaded pallets. Three angle irons secured the onshore side of the skid to the pier and cables shackled to two ring bolts on the offshore side were attached to stanchions on the pier shed. When not in use, the skid was easily dismantled and stored on the wharf. The surface of the skid and the stringpiece were about twenty to twenty-five feet below the deck and the skid was not used to board the

vessel. A safety net or "saveall," loosely strung between the bulwark of the ship and the outer edge of the skid, served to catch any cargo that might fall.

Parisi was working on the skid when a pallet suspended from the Copiapo's cables broke, spilling a draft of cargo onto the skid and into the water. A bronze case struck Parisi's leg and knocked him into the water. Although saved from drowning by a fellow longshoreman, Parisi suffered totally disabling injuries to his shoulder, head, leg and foot. Treating the accident as though it had occurred on land, Pittston and Michigan Mutual commenced paying the maximum rate of compensation under the New York Workmen's Compensation Law— $55. per week. And when Parisi filed a claim for compensation under the federal Longshoremen's Act, 33 U.S.C. § 901 et seq., they asserted that his only remedy was under the State Act. But the Deputy Commissioner, after a hearing, concluded that the Longshoremen's Act applied because the injury "was sustained upon the navigable waters of the United States." He then entered an award for $70. per week—the maximum rate of compensation payable under the Longshoremen's Act—during the continuation of Parisi's temporary total disability plus a lump sum of $630. to cover, retroactively, the difference between $70. per week and the $55. paid weekly under the State Act.[1] This action, seeking judicial review of the administrative decision, followed.

### I.

The 1927 Longshoremen's and Harbor Workers' Compensation Act, like most statutes, cannot be considered *in vacuo*, but must be understood in the context of the judicial history which led to its passage. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), marks the genesis of that history. There, the Supreme Court concerned itself with the reach of a state compensation act, holding that such a statute could not be applied, constitutionally, to an injury suffered on a gangway running from a vessel on navigable waters to a pier. Considerations of uniformity, it said, required that jurisdiction to award compensation for such injuries be exclusively federal. Two successive Congressional attempts to allow the application of state law were struck down as improper delegations. Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); State of Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924). At the same time, however, Jensen's absolute rule was modified by the "maritime but local" doctrine, which provided that state jurisdiction could extend to maritime activities which were of local as opposed to national concern. See 76 Harv.L.Rev. 96 (1962).

In part because these decisions produced "no reliable determinant of valid state law coverage," Calbeck v. Travelers Ins. Co., 370 U.S. 114, 118, 82 S.Ct. 1196, 1199, 8 L.Ed.2d 368 (1962), Congress passed the Longshoremen's and Harbor Workers' Compensation Act in 1927. Section 3(a) of the Act provides that "[c]ompensation shall be payable * * only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death * * * may not validly be provided by State law."

As we read the legislative history, the 1927 statute was intended to cover injuries incurred on temporary devices over navigable waters—such as skids or gangplanks. In this connection, it is pertinent that the Senate Judiciary

---

1. The federal statute permits a maximum weekly recovery of $70., 33 U.S.C. § 906 (b), § 908(b), with total benefits limited to $24,000, 33 U.S.C. § 914(m). In contrast, the State Act provides a maximum weekly award of $55., with gross compensation for a temporary total disability limited to $6500. McKinney's Consolidated Laws of New York, c. 67, Workmen's Compensation Law (1964 Cum.Supp.) § 15, subd. 2.

Committee considering the Longshoremen's Act noted that

> "injuries occurring in loading or unloading are not covered unless they occur on the ship or *between the wharf and the ship* so as to bring them within the maritime jurisdiction of the United States." Sen.Rep. 973, 69th Cong., 1st Sess., p. 16. (Emphasis added.)

The Act was designed to provide a federal compensation remedy for just that kind of injury where relief from the state might have seemed to be precluded by Jensen. Calbeck, supra, 370 U.S. at 120–122, 82 S.Ct. 1196. On the other hand, injuries upon wharves or other extensions of land permanently covering navigable waters were not to be covered. See Swanson v. Marra Bros., 328 U.S. 1, 7, 66 S.Ct. 869, 90 L.Ed. 1045 (1946); cf. Wiper v. Great Lakes Engineering Works, 340 F.2d 727 (6 Cir. 1965).

The problem put squarely to us here, therefore, is whether, with the beneficent purposes of the Longshoremen's Act and the reasons for drawing a federal-state dividing line in mind, a skid extending over navigable water resembles more closely a gangway—temporarily bridging the space between vessel and pier—or a pier permanently removing the underlying water from navigation. In resolving this, we should eschew exclusive reliance on spatial dissections which ignore the objectives of the Act, and beware of

> "the dangers of a 'jurisprudence of conceptions' * * * the extension of a maxim or a definition with relentless disregard of consequences to 'a dryly logical extreme.' * * * In such circumstances, * * * general maxims * * * framed alio intuitu * * * must be reformulated and readapted to meet exceptional conditions." Hynes v. New York Central R. R. Co., 231 N.Y. 229, 235–236, 131 N.E. 898, 900, 17 A.L.R. 803 (1921) (Cardozo, J.).

We are persuaded that the temporary skid was not part of, and should not be analogized to, the wharf. A wharf or pier is usually built on pilings over what *was* navigable water. When the structure is completed, the water over which it is built is *permanently* removed from navigation as if the structure had been in the first instance built on land. In contrast, a skid like a gangplank is not a permanent structure and the waters under both are as navigable as they would be if a ship were moored in the same space and then sailed. See, e. g., Boston Metals Co. v. O'Hearne, 329 F.2d 504 (4 Cir.), cert. denied, 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964); cf. Jeffers v. Foundation Co., 85 F.2d 24, 25 (2 Cir. 1936). The skid occupied the position above the water only temporarily; it was removed from its space over the water and stored until needed again, much like a gangplank. Cf. Hastings v. Mann, 340 F.2d 910, 911 (4 Cir. 1965), cert. denied, 85 S.Ct. 1106. While a gangplank might be thought different from a skid because it is customarily ship's equipment, to make ownership the determinative factor is to resort to a wooden criterion inappropriate to a compensation scheme. And, it is interesting in this connection to note that the Longshoremen's Act was held to apply to an injury on a gangway *not* owned by or kept on the ship because it was "used to provide ingress to and egress from the vessel." See Caldaro v. Baltimore & O. R. R. Co., 166 F.Supp. 833, 836 (E.D. N.Y.1956). The relevant inquiry, therefore, is not who owns the equipment but whether the injury occurred over and thus upon navigable waters.[2]

We believe T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928), inconclusive, as well as outdated, authority for the proposition that the skid must be considered an extension of land outside the reach of the Longshoremen's Act. In Taylor, a longshoreman was struck by a swinging sling

---

2. The broad federal compensation coverage is justifiable where, as here, the injury on the temporary protrusion over navigable waters is compounded by the risk of drowning; this risk is usually not present when the injury occurs on the pier.

while standing on a stage that rested solely upon a wharf and "projected a few feet over the water to or near the side of the vessel"; he was knocked off the stage into the water where sometime later he was found dead. The Court simply held that application of a state compensation statute did not encroach upon federal admiralty jurisdiction. Mr. Justice Butler understandably did not mention the Longshoremen's Act for the federal remedy was not yet effective. We do not question that the skid on which Parisi was injured was sufficiently connected with the land to sustain an award under the State Compensation Act. But to concede this does not mean that a federal remedy is precluded; the Longshoremen's Act was intended to provide compensation for all injuries occurring upon navigable waters, "whether or not a particular injury might also have been within the constitutional reach of a state workmen's compensation law." Calbeck, supra, 370 U.S. at 117, 82 S.Ct. at 1198.[3]

## II.

Our decision to uphold the award is also compelled by Section 20 of the Act, 33 U.S.C. § 920, which provides that "[i]n any proceeding for the enforcement of a claim for compensation * * * it shall be presumed, in the absence of substantial evidence to the contrary—(a) [t]hat the claim comes within the provisions" of the Act. And, the Supreme Court's holding in Davis v. Department of Labor, etc., 317 U.S. 249, 257, 63 S.Ct. 225, 87 L.Ed. 246 (1942) is quite in point. The Court informed us that the administrative determination that a case falls within the federal jurisdiction is "entitled to great weight and will be rejected only in cases of apparent error." We believe that our judicial function has been completed when, as here, it is evident that the Deputy Commissioner's choice is substantially rooted in the record evidence and is not contrary to law. O'Leary v. Brown-Pacific-Maxon,

---

3. Quite apart from the fact that "since the Supreme Court has claimed the field of maritime personal injury litigation as its own, lower court decisions have suffered from rapid technological obsolescence," Gilmore & Black, Admiralty 253 n. 12 (1957), we do not consider Vega v. United States, 86 F.Supp. 293 (S.D. N.Y.1949), aff'd per curiam, 191 F.2d 921 (2 Cir. 1951), cert. denied, 343 U.S. 909, 72 S.Ct. 640, 96 L.Ed. 1326 (1952), controlling. Contrary to the dissent, we find no indication in the District Court's opinion that the platform on which the injury occurred protruded over the water, nor would we consider something "nailed and bolted" to the pier to be a "temporary fixture." In fact, the Court did not consider, as we must here, whether the injury was incurred "upon the navigable waters."

Moreover, we are not persuaded that ancient decisions fixing the limits of admiralty jurisdiction should be determinative when the issue is whether a Deputy Commissioner's conclusion that an injury occurred "upon the navigable waters," within the meaning of the Compensation Act, is contrary to the law. Indeed, the dissent's recognition that in enacting the 1927 Act Congress chose the phrase "upon the navigable waters," rather than "within the admiralty jurisdiction," suggests rejection, rather than adoption, of distinctions evolved in fixing the reach of the federal admiralty jurisdiction. And surely Cleveland Term. & Valley R. R. Co. v. Cleveland S.S. Co., 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508 (1908), and The Troy, 208 U.S. 321, 28 S.Ct. 416, 52 L.Ed. 512 (1909), holding that admiralty lacks jurisdiction of a claim for damages when a vessel strikes a bridge, should have no relevance in deciding whether a stevedore is entitled to compensation for a personal injury. See also Baskin v. Industrial Accident Comm'n, 338 U.S. 854, 70 S.Ct. 99, 94 L. Ed. 523 (1949), vacating and remanding 89 Cal.App.2d 632, 201 P.2d 549 (1949), and suggesting that the "twilight zone" concept of Davis v. Department of Labor, etc., 317 U.S. 249, 63 S.Ct. 225, 87 L. Ed. 246 (1942), applies even where the earlier precedents are unequivocal. See Rodes, Workmen's Compensation for Maritime Employees: Obscurity in the Twilight Zone, 68 Harv.L.Rev. 637, 642–43 (1955).

Nor does Fredericks v. American Export Lines, Inc., 227 F.2d 450 (2 Cir. 1955), preclude a holding that an injury on a temporary skid is covered by the Longshoremen's Act. There the Court held only that the seaworthiness warranty did not extend to a skid, not owned by the ship, because it was not ship's equipment.

Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 95 L.Ed. 483 (1951); Lumber Mutual Casualty Ins. Co. v. O'Keeffe, 217 F.2d 720 (2 Cir. 1954). This principle was reaffirmed only a week ago when the Supreme Court upheld an award based upon a Deputy Commissioner's determination that an accident "arose out of and in the course of employment" within the meaning of the Longshoremen's Act. O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc., 85 S.Ct. 1012 (U.S. March 30, 1965). In reversing an appellate court judgment which overturned the award, the Court emphasized that the very narrow scope of judicial review "is in accord with the humanitarian nature of the Act"; "the inferences drawn by the Deputy Commissioner [even when the basic facts are stipulated]," the Court noted, "are to be accepted unless they are irrational or 'unsupported by substantial evidence on the record as a whole.' "

■ Furthermore, it is of some importance to note that Calbeck, supra, has been interpreted, in every appellate decision where the question has arisen, as mandating that a federal compensation award must be upheld if there is a reasonable argument for coverage under the Longshoremen's Act. See Interlake S.S. Co. v. Nielsen, 338 F.2d 879 (6 Cir. 1964), petition for cert. filed, 33 U.S.L. Week 3323 (U.S. March 30, 1965); Boston Metals Co. v. O'Hearne, 329 F.2d 504 (4 Cir.), cert. denied, 379 U.S. 824, 85 S Ct. 49, 13 L.Ed.2d 34 (1964); Holland v. Harrison Bros. Dry Dock & Repair Yard, Inc., 306 F.2d 369 (5 Cir. 1962). Thus,

in Boston Metals, the injury occurred aboard a vessel deliberately but temporarily run aground in what was otherwise navigable waters; since the waters were not permanently removed from navigation, the federal award was sustained. And Interlake involved a shipkeeper killed when, in the course of checking the moorings of a vessel, he drove a car off the end of a wharf and crushed his skull on the frozen surface of Lake Erie, the Court there ruling that the injury occurred "upon the navigable waters" within the meaning of the Longshoremen's Act.[4]

We do not question the argument that the statutory presumption of coverage and the overlapping sanctioned by Calbeck create uncertainties and complexities. But this was recognized long ago when the Supreme Court noted that the boundaries are "undefined and undefinable with exact precision." Davis, supra, 317 U.S. at 255–256, 63 S.Ct. at 229. It is too late to resort to simplistic, mechanistic formulas in the quixotic quest for a fixed line of demarcation, especially since such a goal, desirable though it may be, is not attainable in the developing and ever-changing maritime law. "Federal and state enactments have so accommodated themselves to the complexity and confusion introduced by the Jensen rulings," Mr. Justice Frankfurter once remarked, "that the resources of adjudication can no longer bring relief from the difficulties which the judicial process itself brought into being." Davis, supra, 317 U.S. at 259, 63 S.Ct. at 230 (concurring opinion).[5]

---

4. In view of the reasons we have articulated for our holding we find it unnecessary to decide whether the award may also be sustained on the ground that the Admiralty Extension Act of 1948, 46 U.S.C. § 740, enlarged the coverage of the Longshoremen's Act. Compare, Interlake, supra, with American Export Lines, Inc. v. Revel, 266 F.2d 82, 84 (4 Cir. 1959.)

5. The "twilight zone" concept articulated in Davis, supra, has been aptly described as "designed to include within a wide circle of doubt all water front cases in-

volving aspects pertaining both to the land and the sea where a reasonable argument can be made either way." Moores's Cases, 323 Mass. 162, 167, 80 N.E.2d 478, 81, aff'd sub nom. Bethlehem Steel Co. v. Moores, 335 U.S. 874, 69 S.Ct. 239, 93 L.Ed. 417 (1948). It was even suggested, before the 1962 Calbeck decision, that the Supreme Court had abandoned any attempt to give effect to the statutory limitation in the Longshoremen's Act. "Such a departure could be justified," one law review writer noted, "on the ground that the statutory language was intended to insure benefits to

In any event, our reluctance to draw the equivalent of a Plimsoll line here imposes no great hardship upon the stevedoring industry which must, as a practical matter, insure under both state and federal acts. And the precedents from which such a line would be derived have only antiquarian value when viewed in the light of the "radical reconstruction" in maritime personal injury law that we have witnessed since 1940. See Gilmore & Black, Admiralty 253 (1957). The effort in every case should, rather, be to follow the Supreme Court's twice-voiced directive that the Longshoremen's Act "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." Reed v. The S. S. Yaka, 373 U.S. 410, 415, 83 S.Ct. 1349, 1353, 10 L.Ed.2d 448 (1964); Voris v. Eikel, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953). Applied to this case, that policy compels us to sustain the Deputy Commissioner's award.

Affirmed.

HAYS, Circuit Judge (dissenting):

I dissent.

The decision of the court is contrary to decisions of the Supreme Court and of this court virtually identical in their factual setting. T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928); Vega v. United States, 191 F.2d 921 (2d Cir. 1951), affirming per curiam 86 F.Supp. 293 (S.D.N.Y. 1949), cert. denied, 343 U.S. 909, 72 S.Ct. 640, 96 L.Ed. 1326 (1952); Jeffers v. Foundation Co., 85 F.2d 24 (2d Cir. 1936).

Our problem is whether we draw the line separating land from navigable waters at one point or at another.[1] Any rule that we apply is necessarily arbitrary from the longshoremen's point of view because the boundary line between land and sea is crossed by a great deal of traffic and many injuries occur near the line. Accepting this situation, we should adhere to a rule as simple to understand and apply as possible:

Gilmore and Black state that:

"Whether or not the injury occurred on navigable waters would be a trifle harder [than determining certain exclusions for Government employees], but that determination could be made in most cases without too much toil and sweat (bearing in mind that while the dock is an extension of the land and not navigable waters, the gangway is an extension of the ship and is navigable waters)." Admiralty 339 (1957).

The simplest rule to apply is that suggested by the traditional law as set forth in Gilmore and Black: an extension of the land such as a pier is part of the land,

certain workers, was responsive to a climate of judicial decision that no longer existed, and may be abandoned to the extent necessary to give effect to the underlying policy of the Act." Rodes, Workmen's Compensation for Maritime Employees: Obscurity in the Twilight Zone, 68 Harv.L.Rev. 637, 646 (1955).

1. Longshoremen's and Harbor Workers' Compensation Act § 3(a), 44 Stat. 1426 (1927), 33 U.S.C. § 903(a) (1958):
"Compensation shall be payable under this Act in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. * * *"

In the case of Calbeck v. Travelers Ins. Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed. 2d 368 (1962), to which the majority opinion refers, the Supreme Court was not concerned with interpretation of the statutory phrase "an injury occurring upon the navigable waters of the United States," but with the construction of the words "if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." For comment on the effect of Calbeck, see Gainsburgh and Fallon, Calbeck v. Travelers Ins. Co.: The Twilight's Last Gleaming?, 37 Tul. L.Rev. 79 (1962); The Supreme Court —1961 Term, 76 Harv.L.Rev. 75, 95–97 (1962); 48 Cornell L.Q. 532 (1963); 1963 Duke L.J. 327; 31 Fordham L.Rev. 398 (1962); 10 U.C.L.A.L.Rev. 1225 (1963).

and an extension of the ship, such as the gangway, is on navigable waters. By natural development from this rule an extension of the pier, such as the skid in the present case, is land.

The case of Vega v. United States, 191 F.2d 921 (2d Cir. 1951), affirming per curiam 86 F.Supp. 293 (S.D.N.Y.1949), cert. denied, 343 U.S. 909, 72 S.Ct. 640, 96 L.Ed. 1326 (1952), is almost exactly on point. The injury in that case occurred upon a platform "eight to twelve inches above the level of the pier to which it was nailed and bolted." Not only did this platform overhang the water, as did the skid in this case, but it was a temporary fixture of the pier, upon which the ship's gangway rested, "built and maintained * * * to facilitate the ingress and egress of the employees engaged in the [ship's] conversion." 86 F.Supp at 293. The district court dismissed the injured workman's claim. The court stated that:

> "The platform on which libellant slipped and fell was not a part of the [ship], nor attached to it. It was nailed and bolted to the pier. In contemplation of the law it is 'to be deemed an extension of the land.' T. Smith & Son v. Taylor, 276 U.S. 179, 182, 48 S.Ct. 228, 229, 72 L.Ed. 520 [1928]. * * *" 86 F.Supp. at 294.

On appeal, this court affirmed per curiam, without discussion of what must have seemed an obvious application of principles of maritime law.

In T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928), the death of a longshoreman was caused by his being knocked into the water from a stage that rested upon a wharf and that "projected a few feet over the water to or near the side of the vessel." 276 U.S. at 181, 48 S.Ct. at 229. The Supreme Court held unanimously that the longshoreman's fatal injury "was given and took effect while deceased was upon the land." Id. at 182, 48 S.Ct. at 229.

The facts on which this court based its decision in Jeffers v. Foundation Co., 85 F.2d 24 (1936), are also similar to the facts of the instant case. A workman was injured while working in a temporary cofferdam, used in laying the foundation for a bridge pier. The court stated that "a man injured while at work upon a pier or abutment, *even though that projects into navigable water*, is not within the 'general admiralty jurisdiction.'" Id. at 25. (Emphasis added.)

The fact that an injury occurred upon a structure which at times swung out over otherwise navigable waters did not persuade the Supreme Court in The Troy, 208 U.S. 321, 28 S.Ct. 416, 52 L.Ed. 512 (1908), that it should distinguish the case from that where an injury occurred on a stationary pier. Cleveland Term. & Valley R. R. Co. v. Cleveland S.S. Co., 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508 (1908).

Part II of the court's opinion wisely eschews "simplistic, mechanistic formulas in the quixotic quest for a fixed line of demarcation * * * in the developing and ever-changing maritime law." But what is to be said of the formula set out in Part I, i. e., that the statute applies because "a skid like a gangplank is not a permanent structure and the waters under both are as navigable as they would be if a ship were moored in the same space and then sailed"? By the very terms of the Act, "spatial dissections" must be made. The court's decision necessarily displaces as much land as is necessary to float the longshoreman's claim.

I am not aware of any newly discovered commercial or other exigencies which call upon us to extend jurisdiction under the Act or to expand the protection of the Act to cover new fact situations. When Congress adopted the Admiralty Extension Act[2] it had an opportunity to

---

2.  62 Stat. 496 (1948), 46 U.S.C. § 740 (1958):

    "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land. * * *"

expand federal compensation to cover all longshoremen's injuries caused in loading and unloading vessels. Congress did not take advantage of that opportunity. S.Rep.No.1593, H.R.Rep.No.1523, 80th Cong., 2d Sess. (1948), reprinted in [1948] 2 U.S.Code Cong.Service, p. 1898; American Export Lines, Inc. v. Revel, 266 F.2d 82, 84 (4th Cir. 1959). When Congress enacted the Longshoremen's Act in 1927, incorporating the phrase "upon the navigable waters," in preference to the phrase "within the admiralty jurisdiction," [3] there was a conscious choice of adopting known distinctions based on the pre-existing admiralty decisions, rather than tying the scope of the Act to changing concepts of maritime jurisdiction.

The judicial task is one of interpreting the statutory phrase "upon the navigable waters" in the light of the congressional purpose in 1927 of supplementing state compensation acts where necessary. There is no need to create new and even more difficult distinctions in these already muddy waters.

---

3. S. 3170, 69th Cong., 1st Sess. § 3 (1927), as originally drafted. See 370 U.S. at 122–124, 82 S.Ct. at 1201–1202.